IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JESSIE BUCHANAN                                                                                      PLAINTIFF
ADC #099656

v.                              No: 4:22-cv-00287-BSM-PSH

ROBERT PIERCE, *et al.*                                                                         DEFENDANTS

PROPOSED FINDINGS AND RECOMMENDATION

INSTRUCTIONS

The following Recommendation has been sent to United States District Judge Brian S. Miller. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

DISPOSITION

I. Introduction

Plaintiff Jessie Buchanan, an inmate at the Arkansas Division of Corrections' Cummins Unit, filed a complaint pursuant to 42 U.S.C. § 1983 on March 28, 2022, raising retaliation and equal protection claims (Doc. No. 2). Buchanan sued Deputy Warden Robert Pierce, Deputy Warden of Treatment Lewis Young, and

Classification Officer Marcie L. Nash. Doc. No. 10, *First Amended Complaint*. He alleged that Pierce and Young instructed another prison official to charge him with a disciplinary on November 12, 2021. *Id.* at 7-8. As a result of the disciplinary charges, he lost his job assignment and was moved to a barracks on the East Hall with "horrific and lawless conditions" and more dangerous Class IV inmates. *Id.* at 7-9. Buchanan alleged that after he was found not guilty of the disciplinary charges, he asked Pierce and Nash if he could be reclassified and given back his original job and housing assignments. *Id.* He filed a grievance against Pierce and Nash after he was not reassigned, and they along with Young allegedly retaliated against him by blocking his efforts to appear before the classification committee. *Id.* at 8. He states their efforts resulted in him being kept in dangerous barracks for three and a half months and prevented him from obtaining another job assignment. *Id*. Buchanan further alleges that Young refused another officer's request to assign him the position of gym/recreation porter. *Id.* He also alleges that white inmates are treated more favorably than black inmates and given better job assignments despite their poor disciplinary history. *Id.* at 9-11.

Buchanan's claims against defendant Nash were dismissed without prejudice for failure to exhaust available administrative remedies. Doc. No. 39. His claims against Pierce and Young (the "Defendants") remain. *Id.* Before the Court is a motion for summary judgment, brief in support, and statement of undisputed

material facts filed by the Defendants (Doc. Nos. 50-52); Buchanan's response in opposition to Defendants' motion (Doc. No. 67); and Buchanan's response in opposition to the Defendants' statement of undisputed material facts (Doc. No. 68). For the reasons described herein, the undersigned recommends that the Defendants' motion for summary judgment be granted.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but instead must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". FED. R. CIV. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III.  Facts[1]

#### *The Cummins Unit's East and West Halls*

Plaintiff Jessie Buchanan has been housed at the ADC's Cummins Unit since February 10, 2020. Doc. No. 50-1, *Deposition of Jessie Buchanan* ("*Buchanan Deposition*"), at 4:19-21.[2] There are currently 1,998 inmates at the Cummins Unit.

---

[1] Unless otherwise noted, these material facts are taken from the parties' statements of facts (Doc. Nos. 52 & 68) and the exhibits provided by the parties, including Buchanan's deposition testimony. Disputed facts are noted. Opinions, legal conclusions, and immaterial facts are omitted.

[2] Page numbers refer to the deposition page numbers, not the document's page numbers on the Court's ECF filing system.

Doc. No. 50-3, *Declaration of Lewis Young* ("*Young Declaration*"), at ¶ 12. The Cummins Unit has an East Hall, a West Hall, and a separate building to the south. *Buchanan Deposition* at 8:10-18. The West Hall contains 248 "pods" or dorm-style rooms. *Young Declaration* at ¶ 13. These are one-man rooms where inmates receive their own key. *Id.* Cummins is the only ADC facility with these types of pods, and they are highly sought after by Cummins inmates. *Id.* at ¶¶ 13-14. According to Young, due to the scarcity of the pods inmates are often immediately removed from these housing assignments if they receive a disciplinary. *Id.* at ¶¶ 9, 15. Buchanan disputes that inmates are immediately moved once they receive a disciplinary and cites several examples of inmates who were not immediately moved after receiving a disciplinary. *See* Doc. No. 68, *Buchanan's Statement of Disputed Facts,* at ¶ 1.

According to Buchanan, the West Hall is primarily for Class I-C inmates while the East Hall houses inmates in classes II, III, and IV. *Buchanan Declaration* at 9:5-9. Buchanan has been a Class I-C inmate for 18 or 19 years. *Id.* at 30:1-3, 24:8-9. He lived in the West Hall from the time he arrived at the Cummins Unit in 2020 until November 10, 2021. *Id.* at 30:9-12. According to Young, there are Class I-C inmates housed in the East Hall and it is not exclusive to Class II-IV inmates. *Young Declaration* at ¶ 11.

### The November 10, 2021 Incident & Disciplinary

On November 10, 2021, Buchanan was working as an office porter in a

treatment office in the West Hall.  *Buchanan Deposition* at 7-11.  He and Coach Thomas Burnett[3] were watching the Kyle Rittenhouse trial[4] on a television in the treatment office.  *Id.;* Doc. No. 50-6, *Declaration of Thomas Burnett* ("*Burnett Declaration*"), at ¶ 7.  Burnett and Buchanan got into a heated debate about the trial.  *Id.* at ¶ 6; *see also Buchanan Deposition* at 7:11-23.  Program supervisor Lisa Bailey[5] overheard their exchange and wrote Buchanan a disciplinary, stating she overheard Buchanan say to Burnett, 'I ought to whip your ass'."[6]  Doc. No. 50-5, *Witness Statement of Lisa Bailey*; Doc. No. 50-4, *Declaration of Lisa Bailey* ("*Bailey Declaration*") at ¶ 11.

According to Buchanan, he and Burnett left the treatment office and went to the gym to work.  *Buchanan Deposition* at 18:4-6.  While standing at the gym's

---

[3] Thomas Burnett is the recreation supervisor at the Cummins Unit; he is often called "Coach Burnett."  *Burnett Declaration* at ¶¶ 2-3.

[4] Rittenhouse, aged 17, shot three men in Kenosha, Wisconsin in August 2020, killing two of the men, amid protests following the shooting of a Black man by a white police officer.  He was charged with criminal counts including homicide and was acquitted in November 2021 on grounds of self defense.  "What to Know About the Trial of Kyle Rittenhouse," Nov. 19, 2021, NYTimes.com.

[5] Lisa Bailey works as a program specialist in the treatment office; she supervises various programs and teaches a class called "Think Legacy" that helps inmates become productive members of society.  *Declaration of Lisa Bailey* (Doc. No. 50-4) at ¶¶ 2-4.

[6] According to Bailey and Burnett, Bailey was in the treatment office watching the trial with Burnett and Buchanan.  *Bailey Declaration* at ¶¶ 7, 9-12.  Buchanan maintains she walked in, sat briefly, and then left abruptly.  Doc. No. 68 at ¶ 3.  He disputes that he cussed at Burnett or that Bailey scolded him in the treatment room.  *Id.* at ¶ 2.  These factual disputes are not material to this case.  Neither Burnett nor Bailey are defendants in this case, and Buchanan makes no claim concerning what happened on November 10, 2021.

entrance with Burnett and Coach Shelby Bailey, security staff exited and handcuffed Buchanan. *Id.* at 37:17-19. He was taken to Captain Lee's office where he explained what happened with Burnett while watching the trial, and Lee then telephoned Burnett. *Id.* at 24:13-25-25:1-12. Buchanan then wrote a statement and left. *Id.* at 25:8. At some point, Burnett provided a witness statement stating that he and Buchanan "talked out" their differences. Doc. No. 50-7. Burnett stated in his declaration that Buchanan cussed him during their heated discussion, but claims they "talked it out later" and he had promised Buchanan he would not charge him with a disciplinary violation. *Burnett Declaration* at ¶ 7.

A few hours later, Buchanan was told to pack his things and was moved out of 2 barracks to 9B barracks on the East Hall. *Id.* at 25:21-24-26:2-3. He was moved because of the major disciplinary written by Bailey, charging him with verbally threatening Coach Burnett. Doc. No. 50-9, *Major Disciplinary Violation,* at 1; *Bailey Declaration* at ¶ 17. Although he received a disciplinary and was moved, he remained a Class 1-C inmate. *Buchanan Deposition* at 24:8-9.

Buchanan claims he stopped by the treatment office to pick up some of his things on his way to 9B barracks, and while there, Bailey told him that she issued the disciplinary because Young and Pierce wanted him moved and told her to do so. *Buchanan Deposition* at 33:20-25-34:1-5. *See also First Amended Complaint* at 6-7. Bailey does not address this allegation in her declaration, but claims that she has

seen Buchanan bully and threaten other inmates, including another inmate who works in the West Hall; she claims she has heard him tell other inmates he would "whip their ass." *Bailey Declaration* at ¶¶ 14-15. According to Bailey, the November 10, 2021 incident was the final straw, and she wrote him a disciplinary because she believed he should be moved and lose his job as an office porter. *Id.* at ¶ 16-17. Buchanan disputes that he has bullied or threatened other inmates and submitted an affidavit from another inmate describing Buchanan as a positive mentor to him and other inmates who "has always exhibited leadership, respect and concern for staff and inmates." Doc. No. 68 at ¶ 5; Doc. No. 68 at 13 (*Affidavit of Jeremy Hawkins #129150*).

At a disciplinary review hearing one week later, November 17, 2021, Buchanan was found not guilty and the charges were dismissed. Doc. No. 50-9 at 2; *Buchanan Deposition* at 19:17-22; Doc. No. 50-2, *Declaration of Robert Pierce* ("*Pierce Declaration*"), at ¶ 10.

### Buchanan's Requests for Reclassification and Job Assignments

Buchanan testified in his deposition that after the disciplinary was dismissed, he briefly talked to Pierce who said that he would "put [him] up" for a job change and reclassification. *Buchanan Deposition* at 54:8-10, 56:19-25. He also sent Pierce two requests for interviews and sent one to Classification Officer Marcie Nash,

asking why he was not reclassified following the dismissal of the disciplinary. *See First Amended Complaint* at 25-27.

Buchanan testified that he also wrote a grievance to cover himself, while waiting on Pierce to reclassify him. *Id.* at 13-15. On December 1, 2021, Buchanan submitted grievance CU-21-01624, stating:

> I am being retaliated against by Deputy Warden of Security, Robert Pierce and classification. Upon my disciplinary being "dismissed on 11/17/2021, I should have either been automatically reinstated or allowed to appear before the classification committee and reinstated back to my initial job and room in 2 Bks. Prior to the disciplinary ever being written; Capt. Lee, a "highly professional commander" had already investigated the incident with the staff who had "direct knowledge" (Coach Barnett). He told Capt. Lee and gave a written statement, it was a heated conversation that was resolved and warrant no disciplinary action. A few hours later, Deputy Warden Pierce and/or classification retaliated (first) by moving me from my single-man-room to open barrack on the (East Hall) "Hoe Squad Bks" where there are prodominatly Class IV's and "rule violators of all types." Facts, I've been incarcerated for (29) twenty-nine years with a good institutional record. Class I-C for approximately 18 years, no contraband charges, dirty urines or any assault on staff. One heated conversation in 30 yrs, I'm retaliated against and punished? To further illustrate the continuation of retaliation of Mr. Pierce and classification, Coach Bailey had Mrs. Cook classification to put me for a Recreation Porter as an alternative, still to no avail. An "animus Retaliation" for a dismissed disciplinary.

*First Amended Complaint* at 13.[7]

On December 13, 2021, Nash emailed Pierce and Young, stating: "What do

---

[7] Grievances are transcribed verbatim without any corrections for misspellings or mistakes.

you want to do about Inmate Buchanan. He wrote a grievance about not being returned to his job/room assignment after his disciplinary was dismissed. Coach S. Bailey has requested him for a gym porter." Doc. No. 50-10, *Marcie Nash Email,* at 1. In response to Nash's email, Pierce replied: "I would be okay with that." *Id.* at 2. However, Young replied: "He's not entitled to that job. Due to his remarks, he should not work with the program staff. As long as we don't violate his medical restrictions, we can assign him anywhere we need him." *Id.* at 3.[8]

On January 31, 2022, Buchanan sent Young an Inmate Request for Interview, asking to be placed as a gym porter if he could not get his prior job back. *Buchanan Deposition* at 39:23-40:1-7; *First Amended Complaint* at 28. Buchanan noted that he was found not guilty of the November disciplinary, had been Class 1-C for 18 or 19 years, and had been a model inmate. *Id.* Young says that he replied, "not at this time," because his opinion had not changed about Buchanan being ready to work amongst treatment staff.[9] *Young Declaration* at ¶ 18. Buchanan grieved retaliation

---

[8] In her declaration, Lisa Bailey explained that she has final say over who gets to work in the treatment office or one of the treatment programs, and she does not want Buchanan to come back to work in the treatment office due to his past history of explosive behavior. *Bailey Declaration* at ¶¶ 23-24. However, there is no indication she told Pierce or Young this following the reversal of Buchanan's disciplinary or when he filed requests and grievances regarding their failure to move him or give him a new job assignment. Additionally, Buchanan points out that it was Shelvey Bailey, the recreational supervisor, who requested he be assigned to her as a gym porter, and Lisa Bailey had no say in who works in the gym. *See* Doc. No. 68 at ¶ 7.

[9] Defendants point out that Covid-19 was an issue in 2021 and 2022 and limited bed reassignments. Doc. No. 52, *Defendants' Statement of Undisputed Material Facts,* at ¶¶

and racial discrimination by both Pierce and Young the same day, citing their refusal to give him a new job assignment after he was cleared of disciplinary charges. *First Amended Complaint* at 17 (grievance CU22-00150).

On February 23, 2022, Buchanan was assigned to 7A barracks in the West Hall and to work in the West Hall kitchen without first appearing before the classification committee. *First Amended Complaint* at 10, n.2; *Buchanan Deposition* at 27:19 – 28:3; *Pierce Declaration* at ¶ 12; *Young Declaration* at ¶ 19. Young explained that Buchanan was moved then because space opened up in West Hall on that date. *Young Declaration* at ¶ 19.

Buchanan came up for a classification committee review on April 15, 2022.[10] *Young Declaration* at ¶ 20. The meeting was held and a vote taken on April 21, 2022. Doc. No. 50-11, *Classification Review for April 21, 2022*. Buchanan was deferred for one week to determine a suitable job change for him. *Id.* On April 28, 2022, Buchanan was approved for a hall porter position. Doc. No. 50-11, *Classification Review for April 28, 2022*. On April 24, 2022, a pod room became

---

42 & 61 (citing *Young Declaration* at ¶ 10 and *Buchanan Deposition* at 35:18-20). However, they do not claim that this is the specific reason Buchanan was not returned to the West Hall at a sooner date.

[10] According to Young, Class I-C inmates are only entitled to classification review once per year. *Young Declaration* at ¶ 16. Buchanan agrees that a Class I-C inmate with a good job would typically only see classification for their annual review. *Buchanan Deposition* at 42:8-16. But he also asserts that a Class 1-C inmate might also have a classification review to receive a new job assignment. Doc. No. 68 at ¶ 8.

available,[11] and Buchanan was moved to 4 barracks in the West Hall, where he is currently housed. *Pierce Declaration* at ¶ 16.

Buchanan testified that he never spoke with Pierce or Young prior to November 10, 2021, and never had any fights or altercations with either of them. *Buchanan Deposition* at 34:23–35:4-13. Both Pierce and Young claim they had no personal issues with Buchanan and did not retaliate against him. *Pierce Declaration* at ¶¶23-24; *Young Declaration* at ¶¶ 25-26.

### Housing and Job Assignments at Cummins

Buchanan alleges that white inmates are treated more favorably than black inmates in both job and housing assignments. *First Amended Complaint* at 10-11. According to Pierce, Cummins Unit does not use race as a reason to assign inmates to particular jobs or housing, but states that these assignments are made by balancing an inmate's disciplinary record, job skills, medical restrictions, and classification. *Pierce Declaration* at ¶ 22.

To evidence racial discrimination, Buchanan identified two white inmates who were found guilty of major disciplinaries and reduced in class, but were allowed to remain housed in 8A barracks on the West Hall. *See First Amended Complaint* at 29; Doc. No. 68 at ¶ 11. As to the first inmate identified, Pierce states that he

---

[11] It is not clear whether 7A barracks in the West Hall contained a pod room or not.

required a bed with electrical access for a medical device. As to the second, Pierce notes that he was housed in 8A barracks due to a medical restriction. *Pierce Declaration at* ¶¶ 20-21. Both inmates have since been transferred to a different ADC facility. *Id.* Buchanan disputes that these inmates had medical reasons for staying in 8A barracks because 8B barracks is the barracks specially equipped to meet the needs of medically disabled inmates. Doc. No. 68 at ¶ 11 (citing Doc. No. 68 at 14-15, the declarations of Dashgujauhn Danzie and L.M. McGowan, medically disabled inmates who are assigned to 8B barracks). Buchanan also provided a declaration by a black inmate who states that he was not given his job back after receiving a disciplinary while a white inmate who received a disciplinary did get his job back. Doc. No. 68 at ¶ 12 (citing Doc. No. 68 at 16, the declaration of Brandon Craig).

## IV. Analysis

### A. *Sovereign Immunity*

The Defendants correctly assert that Buchanan's monetary claims against them in their official capacities are barred by sovereign immunity. A suit against a defendant in his or her official capacity is in essence a suit against the State of Arkansas, and any official capacity claim for monetary damages against that defendant is barred by the doctrine of sovereign immunity. *Will v. Michigan Department of State Police, et al.*, 491 U.S. 58, 71 (1989); *Nix v. Norman*, 879 F.2d

429, 431-432 (8th Cir. 1989). Accordingly, the undersigned recommends that Defendants be awarded summary judgment with respect to Buchanan's official capacity claims for money damages.

### B. *Qualified Immunity*

The Defendants assert they are entitled to qualified immunity with respect to Buchanan's individual capacity claims. Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015). Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

1. Retaliation Claims.

To succeed on a § 1983 retaliation claim, a plaintiff must prove: (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity. *Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020); *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013). Speculative and conclusory, or *de minimis* allegations cannot support a retaliation claim. *See Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam). A plaintiff must also prove a causal connection between the constitutionally protected activity and the adverse action. *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004). Temporal proximity between a protected activity and an adverse action "is relevant but not dispositive." *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006) (citing *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir. 1999)). To succeed on a retaliation claim, a plaintiff must provide affirmative evidence of a retaliatory motive. *See Haynes v. Stephenson,* 588 F.3d 1152, 1157 (8th Cir. 2009); *see also Wilson*, 441 F.3d at 592 ("[Plaintiff's] belief that [defendant] acted from a retaliatory motive is insufficient.").

Buchanan alleges that the Defendants retaliated against him on two separate occasions. First, he claims they told Bailey to issue him the November 10

disciplinary because they wanted him moved. *Buchanan Deposition* at 54:7-12; *First Amended Complaint* at 7. Second, he claims they refused to give him a new job assignment and move him back to the West Hall after the November 10 disciplinary was dismissed. *First Amended Complaint* at 8-10; *Buchanan Deposition* at 54:13-25-55:1-17, 56:19-25. He specifically asserts that they blocked him from having a classification review to obtain a new job and housing assignment. Doc. No. 68 at ¶ 13.

With respect to the first allegation of retaliation, Buchanan has not identified any protected activity. He describes no prior interaction with Pierce or Young and acknowledges that he had never spoken to them before. *Buchanan Deposition* at 34:23–35:4-13. Accordingly, even if the Court accepts Buchanan's allegation that Bailey told him she wrote the disciplinary at their instruction as true, there is simply no alleged retaliatory motive for the Defendants to instruct Bailey to write him a disciplinary on November 10, 2021. The Defendants are therefore entitled to summary judgment as to this first retaliation claim.

Buchanan's claim that the Defendants retaliated against him after he filed grievances on December 1, 2021, and January 31, 2022, is a harder question. Retaliation for the use of a prison grievance procedure is actionable. *See Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir. 1990) (per curiam) (otherwise proper acts are actionable under § 1983 if done in retaliation for grievances filed under

established prison grievance procedure). Further, denying Buchanan's requests for a new job assignment and move back to the West Hall may be considered an adverse action.[12] However, Buchanan has not shown any causal connection between grievances he wrote and the Defendants' inaction following his requests for a new job assignment or to move him back to the West Hall. He also has not provided any evidence that the Defendants denied him a classification review or job assignment with a retaliatory motive. *See Haynes v. Stephenson,* 588 F.3d at 1157. For these reasons, Buchanan cannot show the necessary connection to or motive for their actions (or inaction). They are therefore entitled to summary judgment on Buchanan's retaliation claims.

    2. Equal Protection Claims.

Buchanan alleges that white inmates receive more favorable job assignments than black inmates, and that white inmates were allowed to stay housed in the West Hall at Cummins despite receiving a disciplinary and reduction in class, whereas he was immediately moved to the East Hall and not returned for three and a half months, even after his disciplinary was reversed. Defendants argue that they are entitled to

---

[12] There is no evidence in this record that Pierce made a decision not to allow Buchanan a new job assignment; rather, the evidence is that Young denied his requests because he believed Buchanan should not be working with certain staff members. However, Buchanan wrote both Defendants asking to be reclassified and did not receive a classification hearing or new job assignment until his routine annual classification review.

summary judgment because Buchanan cannot prove they acted with a racially discriminatory motive.

Pursuant to the Equal Protection Clause of the Fourteenth Amendment, "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1. The Equal Protection Clause has been interpreted to require that "all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). To state a claim of racial discrimination, a prisoner must allege (1) he was treated differently from similarly situated inmates; and (2) the different treatment was the result of intentional and purposeful racial discrimination. *See In re: Kemp*, 894 F.3d 900, 909-10 (8th Cir. 2018); *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008); *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007).

An isolated incident of unequal treatment is insufficient to show that an individual was "systematically and intentionally treated differently." *See e.g., Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) ("A few individual examples of unequal treatment are insufficient to provide more than minimal support to an inference of classwide purposeful discrimination."); *Inmates of Neb. Penal and Correctional Complex v. Greenholtz,* 567 F.2d 1368, 1381 (8th Cir. 1977) (two or

three individual cases of discrimination insufficient to provide more than minimal support to an inference of classwide purposeful discrimination).[13]

Buchanan has offered no evidence to prove that the Defendants intentionally or purposefully discriminated against him based on his race. Rather, he provided a roster indicating that two white inmates were allowed to stay on the West Hall despite being Class II and Class IV and an affidavit by another black inmate, claiming that he was not given a job back after being reclassified as Class I-C, while a white inmate was given his job back after being reclassified as Class I-C. With respect to the white inmates remaining on West Hall, Defendants maintain these two inmates had medical reasons for staying on the West Hall, which Buchanan disputes. But even if Buchanan is correct, there is no evidence providing that these inmates were similarly situated to Buchanan (*i.e.*, that they received disciplinaries for similar behavior occurring in the West Hall) or that either Defendant allowed them to stay on the West Hall based on their race. Likewise, the affidavit by Brandon Craig provides no details showing that he and the white inmate were similarly situated.

---

[13] *See also Thrash v. White*, No. 5:09-CV-00095, 2010 WL 6749181, at *3 (E.D. Ark. Dec. 23, 2010), *report and recommendation adopted,* No. 5:09-CV-00095, 2011 WL 2110372 (E.D. Ark. May 27, 2011) ("An isolated example of unequal treatment is insufficient to establish that the difference in treatment was motivated by Plaintiffs' membership in a protected class, or that it burdened a fundamental right."); *Hughes v. Banks*, No. 1:07-CV-00027, 2011 WL 3861368, at *2 (E.D. Ark. Aug. 19, 2011) (equal protection claim failed where plaintiff only identified one inmate who was allegedly treated differently than him).

And finally, just three examples of white inmates being treated differently is insufficient to show that Buchanan was "systematically and intentionally treated differently" because of his race. *See Weiler v. Purkett, supra.*

Because Buchanan cannot prove that he was systematically and intentionally treated differently than similarly situated inmates, his equal protection claim fails and defendants are entitled to qualified immunity.

## V.  Conclusion

For the reasons stated herein, the undersigned recommends the Defendants' motion for summary judgment (Doc. No. 50) be granted and Buchanan's claims be dismissed with prejudice.

DATED this 29th day of July, 2024.

_____
UNITED STATES MAGISTRATE JUDGE